UNITED STATES

v.

Juan ALMODOVAR.

No. CRIM. A. 93–001.
No. CIV. A. 98–733.

United States District Court,
E.D. Pennsylvania.

May 26, 2000.

William T. Cannon, William T. Cannon, a Professional Corp., Philadelphia, PA, for Juan Almodovar.

Jack Wenik, U.S. Attorney's Office, Philadelphia, PA, for U.S.

## MEMORANDUM

LUDWIG, District Judge.

Defendant Juan Almodovar moves to vacate, set aside or correct his sentence under 28 U.S.C. § 2255. On June 8 and July 6, 1999, evidentiary hearings were held on whether the government's refusal to file a downward departure motion under U.S.S.G. § 5K1.1 amounted to bad faith. For the following reasons, a finding of bad faith will be entered.

On February 9, 1993, defendant, pursuant to a written plea agreement, pleaded guilty to possession with the intent to distribute more than 50 grams of crack cocaine, 21 U.S.C. § 841(a)(1), and use of a firearm during a drug trafficking offense, 18 U.S.C. § 924(c)(1).[1] On December 14, 1995, defendant was sentenced to 210 months imprisonment, five years supervised release, and a $100 special assessment.[2] Defendant appealed his sentence,

1. The firearm count was dismissed on the government's motion, in light of *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995).

2. At sentencing, defendant made a motion for specific performance of the plea agreement to compel the government to file a § 5K1.1 motion for downward departure and requested

the use of cocaine guidelines instead of crack cocaine. Hearings were held to establish that the substance was crack cocaine. The motion to compel was denied. *United States v. Almodovar*, Cr.A. No. 93–001 (E.D.Pa.)(memorandum opinion, March 14, 1996)(finding that regardless of the reason for the government's refusal to file a § 5K1.1 motion there was "decided animus and ill will on the part of the

which was affirmed by our Court of Appeals.[3] *United States v. Almodovar*, 100 F.3d 948 (3d Cir.1996). Certiorari was denied. *Almodovar v. United States*, 519 U.S. 1140, 117 S.Ct. 1013, 136 L.Ed.2d 890 (Feb. 18, 1997). On February 13, 1998, defendant filed a § 2255 motion, citing four grounds, one of which, bad faith, was added by amendment.[4]

## I. Background

Before the time of the sentencing, the government had decided not to file a § 5K1.1 motion. In April and May, 1994, two attorneys replaced those who had handled the case for the government and the defense from its inception. This occurred more than 14 months after defendant had pleaded guilty and after seven sentencing continuances that had been granted for the supposed purpose of cooperation. The new special assistant United States attorney was unwilling to consider filing a downward departure motion. It was apparent that he and the new defense counsel immediately became highly antagonistic to one another. Defense counsel filed a blizzard of motions attacking the guilty plea and various aspects of the government's case. It was unclear who had been

the instigator of their animosity. But, as stated in the sentencing opinion, "the government's refusal to file a 5K1.1 motion appeared to be the direct result of a personality clash between these counsel and, perhaps, because of other personal considerations on the part of the new prosecutor." Memorandum opinion, March 14, 1996 at 2.

No hearing was held on defendant's motion for specific performance of the plea agreement, given the state of the law at that time. However, the credibility of the government's explanation for not filing the substantial assistance motion was highly questionable.[5] Defendant had given essential assistance to the government both before and after his guilty plea, and his deficits as a witness were discovered by the government even before the first scheduled sentencing date. In other words, the government, a year and numerous continuances before it decided not to file the departure motion, was well aware of the main reasons it articulated in its sentencing memorandum for not doing so—defendant's non-disclosure of his real identity and prior record. *See* memoran-

prosecutor"); *see* sentencing transcript, July 21, 1994 at 26.

3. Our Court of Appeals heard oral argument focusing on the following issue:

> having found that the decision to withhold the 5K1.1/3553(e) departure motions was based on 'a decided animus and ill will on the part of the prosecutor,' Judge Ludwig had the right and the responsibility to order specific performance of the oral understandings underlying the plea agreement, including an order directing the prosecution to file the departure motions.

*United States v. Almodovar*, 100 F.3d 948 (3d Cir.1996) (slip op. at 1–2). In affirming, the Court stated, "We are [satisfied] that [the district court] did not abuse its discretion or clearly err in doing so, for the record fully supports the government's decision not to move for a downward departure." *Id.* at 3. The Court cited *United States v. Paramo*, 998 F.2d 1212 (3d Cir.1993), which holds that a sentencing judge may grant a downward departure only if the government's motive for not filing a § 5K1.1 motion was unconstitu-

tional. That decision has now been enlarged to allow district court's to consider whether the government was acting in bad faith. *See United States v. Isaac*, 141 F.3d 477, 484 (3d Cir.1998).

4. Defendant's original § 2255 motion was based on: 1) the government's failure to meet its burden to establish that the substance was crack cocaine, 2) the disparity between defendant's sentence and the sentences of other defendants involved in the same activity, and 3) defendant's sentence was improperly enhanced for obstruction of justice. Following an intervening decision by our Court of Appeals—*United States v. Isaac*, 141 F.3d 477 (3d Cir.1998)—defendant was permitted to amend his motion to include a claim that the government's refusal to file a § 5K1.1 motion was not in "good faith."

5. It is noteworthy that the government's position at the § 2255 habeas shifted its emphasis from defendant's dishonesty and lack of usefulness as a witness to his ultimate failure to supply additional information.

dum opinion, March 14, 1996 at 7. A distinct possibility existed that the departure motion was being withheld for extraneous reasons and not in the spirit of prosecutorial fairness that has traditionally characterized our United States Attorney's Office.

Nevertheless, the law in 1995 offered only the narrow window of the unconstitutionality of government misconduct as a basis for specific enforcement of cooperation agreements. *See supra* n. 2, *citing United States v. Paramo*, 998 F.2d 1212, 1219 (3d Cir.1993). The sentencing opinion expressed serious concerns regarding the government's—and defendant's—approach to a just result in the case. *See* memorandum opinion, March 14, 1996 at 8. However, there appeared to be no cognizable basis to compel a § 5K1.1 motion or to depart from the onerous guidelines range—other than a reduction from Criminal History Category IV to III because of the marked overrepresentation of defendant's criminal record. *See* memorandum opinion, March 14, 1996 at 11–12. Accordingly, a sentence of more than 17 years custody was imposed, far more than any other of the 14 defendants in the Chappel Davis organization including Davis himself. *See id.* at 6 (reviewing the other sentences).

In the § 2255 hearings in 1999, much of the uncertainty as to what had happened at the time of sentencing was dispelled. Testimony was given by the AUSA who had prosecuted the case until a month before the government announced that a § 5K1.1 motion was out of the question. Explanations were received from the new prosecutor, the previous and new defense counsel, and defendant testified. What was depicted was that the new prosecutor had determined not to permit a § 5K1.1 motion regardless of the lengthy history of the case and the understanding reached between the new defense counsel and his predecessor to give defendant another opportunity for further cooperation. That opportunity was the agreed-upon basis for the seventh sentencing continuance, and it was the denial of that opportunity that constitutes the specific instance of bad faith on the government's part. The government's contention that defendant and his counsel did not take advantage of the opportunity must, under the credited circumstances, be rejected.

II. The Law of Specific Performance

■ In *United States v. Isaac*, 141 F.3d 477, 484 (3d Cir.1998), our Court of Appeals held that the government's refusal to move for downward departure under a written plea agreement giving it "sole discretion" within the terms of the agreement is reviewable by district courts for "bad faith." There, when the government did not file the motion at sentencing, defendant moved to enforce the plea agreement. *Id.* Considering Supreme Court precedent[6] and other courts of appeals decisions,[7] *Isaac* determined that performance of the guilty plea agreement is to be re-

6. In *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971), the Court held "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such a promise must be fulfilled." Our Court of Appeals interpreted *Santobello* to require that "although a plea agreement occurs in a criminal context, it remains contractual in nature and is to be analyzed under contract-law principles." *United States v. Moscahlaidis*, 868 F.2d 1357, 1361 (3d Cir.1989). *See also, United States v. Isaac*, 141 F.3d 477, 481–82 (3d Cir.1998) (quoting *Moscahlaidis* ); *United States v. Carrara*, 49 F.3d 105, 107 (3d Cir.1995)("[O]nce the government makes an agreement with the defendant to file a [§ 5K1.1] motion, it is bound by the terms of the agreement.").

7. *See United States v. Rexach*, 896 F.2d 710 (2d Cir.1990) (contract principles apply to enforcement of plea agreements); *see also, United States v. Courtois*, 131 F.3d 937 (10th Cir.1997). *Contra, United States v. Forney*, 9 F.3d 1492, 1501–02 (11th Cir.1993)(government's refusal to file a § 5K1.1 motion may be challenged only for unconstitutional motives). *Isaac* expressly disagreed with *Forney*. *United States v. Isaac*, 141 F.3d at 483.

viewed using contract law principles. It articulated that when a defendant has entered into a cooperation agreement, the government's refusal to file a § 5K1.1 motion must be "based on an honest evaluation of the assistance provided and not on considerations extraneous to that assistance." *Isaac*, 141 F.3d at 484. Because the plea "agreement itself is part of the inducement for the defendant to enter a guilty plea," the government must conscientiously adhere to its terms. *United States v. Huang*, 178 F.3d 184, 187 (3d Cir.1999).

◼ *Isaac's* reasoning followed the analysis in *United States v. Rexach*, 896 F.2d 710 (2d Cir.), cert. denied, 498 U.S. 969, 111 S.Ct. 433, 112 L.Ed.2d 417 (1990), which delineated a subjective standard of good faith. This approach injects the "implied obligation of good faith and fair dealing" into every written guilty plea agreement. *Id.* at 714.

◼ It is defendant's burden to establish by a preponderance the government's violation of the plea agreement. *United States v. Huang*, 178 F.3d at 187 (citing *United States v. Conner*, 930 F.2d 1073, 1076 (4th Cir.1991)). Contract law principles guide the specific performance of plea agreements. However, "a cooperative plea agreement in a criminal sentencing proceeding under current law is not altogether the same as a civil contract dispute, although civil contract law is important and useful in its interpretation." *Id.* at 187–88 (citing *United States v. Khan*, 920 F.2d 1100, 1105 (2d Cir.1990).) *See United States v. Nolan–Cooper*, 155 F.3d 221, 235 (3d Cir.1998) ("In determining whether the plea agreement has been breached, courts must determine 'whether the government's conduct is inconsistent with what was reasonably understood by the defendant when entering the plea of guilty.'") (quoting *United States v. Badaracco*, 954 F.2d 928, 939 (3d Cir.1992)). Moreover, these agreements must also be construed within the confines of the Sentencing Guidelines and applicable sentencing laws.

◼ The sentencing judge has "a very limited role in reviewing the Government's refusal to move for a downward departure." *United States v. Huang*, 178 F.3d at 188 (citing *United States v. Isaac*, 141 F.3d at 483). However, the court has an important interest in seeing that the representations by both the government and the defense concerning the guilty plea agreement are made and carried out in good faith.

Based on the evidentiary hearings and supporting memoranda, the following findings of fact are made.

### III. Findings of Fact

1. On December 3, 1992, petitioner was the first member of the Chappel Davis drug organization to be arrested, and, unknown to his confederates, he immediately began to cooperate with state and federal law enforcement authorities. On February 9, 1993, he pleaded guilty and entered into a guilty plea agreement that was signed by him and the attorneys in the case.[8]

---

8. The relevant terms of the agreement are as follows:

(2.a.) Defendant agrees to provide truthful, complete and accurate information and testimony....

(2.b.) Defendant agrees to provide all information concerning his knowledge of, and participation in the offenses alleged in the indictment and any other crimes about which he has knowledge.

(2.c.) Defendant agrees that he will not falsely implicate any person or entity and he will not protect any person or entity through false information or omission.

. . .

(2.j.) Defendant agrees that if the government determines that the defendant has not provided full and truthful cooperation ... or has otherwise violated any provision of this agreement, the agreement shall be voided by the government....

. . .

(5) If the government in its sole discretion determines that the defendant has fulfilled his obligations of cooperation as set forth above, at the time of sentencing, the government will:

. . .

2. On February 17, 1993, at the government's request, petitioner testified before a grand jury that approved indictments of 14 members of a drug conspiracy, the Chappel Davis group. Eventually, all of these defendants pleaded guilty, and seven cooperated with the government. *See United States v. Chappel Davis, et al.,* Cr.A. No. 93–00082 (E.D.Pa. Dec. 13, 1994)(Brody, J.). They gave information that Almodovar and his brother had a major role in the cocaine supply chain, which was inconsistent with Almodovar's proffered statements. Hearing transcript, June 8, 1999 at 33, 97.

3. Before the first sentencing date, April 2, 1993, a presentence investigation report prepared by the Probation Office disclosed that Almodovar's real name was Adiel Perez, and that he had another alias besides Almodovar. Presentence investigation report, undated (March 23, 1993). A revised report stated that he had absented himself from a supervised home release program in Connecticut where he was serving a sentence for a drug offense. Revised presentence investigation report, June 26, 1993 at ¶ 33. Originally, he had told AUSA Wenik that he was a first offender who had no prior record. Hearing transcript, June 8, 1999 at 94.

4. In the year post-dating the guilty plea, defense counsel Marley, a federal defender, filed six requests to continue sentencing on each occasion because the scheduling did "not provide either party adequate time to complete the conditions of the plea agreement"—March 23, 1993, May 21, 1993, August 19, 1993, October 28, 1993, December 13, 1993, and January 25, 1994. These continuances were not opposed by AUSA Wenik.[9]

5. In 1993, when the government learned of Almodovar's aliases and previous drug conviction, it had, according to the recollection of the federal defender, "concerns about Mr. Almodovar's seeming lack of candor as a result of this information ... that seemed to be the main hurdle or obstacle at that point as far as further cooperation." Hearing transcript, June 8, 1999 at 14. Thereafter, Almodovar was presented for proffer sessions on November 16, 1993, December 13, 1993, and January 28, 1994. *Id.* at 12, 14, 15. Wenik confronted him with information received from Chappel Davis organization members whom he had testified against before the grand jury. They informed that he was the source of the drugs and not merely a runner who picked up drugs from a garage in the Bronx. *Id.* at 79. He persistently denied being the source of the drugs; he was not polygraphed. Hearing transcript, July 6, 1999 at 76. Wenik asked him for information about drug sources in Connecticut and New York, including the involvement of Almodovar's brother. Hearing transcript, June 8, 1999 at 79–80.

6. In late March, 1994, private defense counsel Cheryl Sturm entered her appearance for Almodovar, replacing the federal defender. After meeting with AUSA Wen-

---

(b) Make a motion to allow the Court to depart from the Sentencing Guidelines pursuant to Sentencing Guidelines § 5K1.1 and to impose a sentence below any mandatory minimum term of imprisonment pursuant to 18 U.S.C. § 3553(e), if the government, in its sole discretion, determines that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense; the filing of such motion, however, will not obligate the government to recommend a downward departure from the sentencing guidelines or the mandatory minimum term of imprisonment.

Guilty plea agreement, at 2–3, 5–6.

9. Wenik agreed to the continuances for two reasons.

One, I felt duty-bound to give Mr. Almodovar's counsel every reasonable opportunity to do what they could for their client. And the other was I always felt that Mr. Almodovar had the ability to make a new case, that this person was somebody extensively involved in drug trafficking in three states ... and that if he chose to do so, he could provide useful and valuable information above and beyond the Chappel Davis organization.

Hearing transcript, June 8, 1999 at 86.

ik on April 25, 1994, hearing transcript, June 8, 1999 at 49, it was Sturm's impression that Almodovar's chances of the government filing a § 5K1.1 motion on his behalf "were in jeopardy" because of the conflicting information from Chappel Davis sources. *Id.* at 46–47. She requested another opportunity for Almodovar to cooperate; AUSA Wenik was reluctant to agree. However, he left open the chance of the government's filing the motion. *Id.* at 48.

7. Soon after her meeting with Wenik, Sturm spoke to defendant about providing the information the government wanted, *id.* at 49, and Almodovar agreed that he would do so. *Id.* at 50–51. On April 28, 1994, Sturm then requested a continuance of sentencing based on her understanding that Almodovar would be brought in for another proffer. *Id.* at 51–52. AUSA Wenik agreed to continue the sentencing but requested that Sturm talk to Almodovar herself first and provide him with an attorney proffer before Almodovar came in for a proffer. *Id.* at 87, 88. That was AUSA Wenik's last contact with the case before leaving the United States Attorney's Office for private practice. *Id.* at 89. The sentencing was continued to July 21, 1994.

8. Mr. Wenik left the United States Attorney's office in early May of 1994, and was replaced by Leonard Deutchman, a deputized Special Assistant United States Attorney and Assistant Philadelphia District Attorney. *Id.* at 93. Mr. Deutchman had worked with Mr. Wenik throughout the prosecution of the Chappel Davis organization and knew about Almodovar from the time of his arrest. Hearing transcript, July 6, 1999 at 3. He was a signer of the guilty plea agreement. Deutchman had met with Almodovar prior to his grand jury testimony; however, Deutchman had not been involved in Almodovar's cooperation until he took over the case from AUSA Wenik. *Id.* at 7. He made no attempt to contact Sturm or to have the defendant brought in for a proffer.

9. On May 25, 1994, Sturm first became aware of the change of prosecutors when she received the government's response to her objections to the Presentence Investigation Report. It was signed by Deutchman. Hearing transcript, June 8, 1999 at 53–54. Sturm talked to Deutchman and explained how she believed the proffer situation had been left with AUSA Wenik. In response, "Mr. Deutchman was evidencing no interest whatsoever in speaking to Mr. Almodovar and he had already made up his mind that there wasn't going to be a 5(k) letter." *Id.* at 68–69.

10. Almodovar agreed to cooperate from the time of his arrest and had numerous proffer sessions with the government. He was indicted by himself. His name was put on the government witness list provided to counsel for Chappel Davis before Davis pleaded guilty. He eventually agreed to discuss drug activity in New York and Connecticut, as requested by Wenik. When interviewed in prison by a special agent, he denied the accusations made by other Chappel Davis organization members, and suggested that they be polygraphed. Hearing transcript, July 6, 1999 at 71.

11. When Deutchman took over the case, he was of the view that the government should not file a § 5K1.1 motion because Almodovar's dishonesty about his identity and criminal history foreclosed any opportunity for cooperation. His sentencing memorandum so states. He also represented that this was Wenik's view. *See* government's sentencing memo., at 7 ("Before he left [Wenik] articulated the position that no departure motion should be filed because [Almodovar] lied at every turn.... SAUSA Deutchman agreed with that assessment ...."); government's memorandum in response to court's briefing order (Sept. 19, 1995), at 8 ("defendant squandered [the opportunity to cooperate with the government] by lying about his identity, his criminal record and the circumstances of his crime.").

12. However, Wenik had promised Sturm, as stated in his testimony, that Almodovar would have an opportunity, albeit a tenuous one, to earn a § 5K1.1 motion. This explains the seventh and last sentencing continuance, which Sturm obtained without objection from the government. At that point, Wenik—and Deutchman—had been well aware of Almodovar's lack of credibility for more than a year.

13. Wenik's agreement with Sturm and the resulting continuance occurred after Almodovar's violations of the plea agreement. Deutchman was aware of Wenik's understanding with Sturm and the government's acquiescence in the continuance request.

14. The government's representations to the court in not opposing the sentencing continuance requests and its subsequent abrupt refusal to give defendant another opportunity to cooperate after it had agreed to do so, both together and separately, constituted breaches of the guilty plea agreement and bad faith on the government's part.

## IV. Discussion

■ Almodovar's motion for specific performance was originally rejected because, prior to *Isaac,* unless defendant could show an unconstitutional motive for the government's failure to file a § 5K1.1 motion, the performance of the guilty plea agreement was nonreviewable. Memorandum opinion, March 14, 1996 at 4 (applying *Wade v. United States,* 504 U.S. 181, 186, 112 S.Ct. 1840, 1843–44, 118 L.Ed.2d 524 (1992)). Subsequently, our Court of Appeals held that an agreement can be reviewed for "good faith." Specific performance of a guilty plea agreement can be ordered if the government's refusal was not based on an honest evaluation of the assistance provided, but on considerations extraneous to the agreement. *United States v. Isaac,* 141 F.3d at 484.

■ Deutchman's attitude toward Almodovar and his new counsel precluded the filing a § 5K1.1 motion, despite previous AUSA Wenik's belief that Almodovar could earn the departure motion by presenting a "new case." As it turned out, this seeming "animus and ill will" was not based on an honest evaluation of what Almodovar had done and was still willing to do. It ignored the history of Almodovar's cooperation, the government's earlier knowledge of his credibility weaknesses, the repeated requests for sentencing continuances in contemplation of a § 5K1.1 motion, and the previous prosecutor's willingness to give defendant a chance to render further assistance. It also ignored the obvious retaliatory motives that existed between the other Davis organization members and defendant after he had made proffers and given testimony that resulted in their guilty pleas.

■ Good faith and fairness require "faithfulness to the agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205, comment a. While Almodovar may have jeopardized his expectation that he would have an opportunity to cooperate, the court was entitled to rely on the repeated cooperation continuance requests in believing that he would be afforded another opportunity. Moreover, after Almodovar probably violated his obligations under the plea agreement, the government still held open an opportunity to cooperate. Here, the government's about-face after Wenik's departure amounted itself to lack of good faith. "[T]he doctrine that the government must adhere to its bargain in the plea agreement is [ ] fundamental...." *United States v. Nolan–Cooper,* 155 F.3d 221, 235 (3d Cir.1998)(citing *United States v. Hayes,* 946 F.2d 230, 233 (3d Cir.1991)).[10]

10. The glaring disparity between the sentences given the other Davis organization defendants and this defendant is not a ground for enforcing the cooperation agreement. *See infra* at 309–10. Nevertheless, the government's attitude in singling out the defendant

■ So viewed, the government will be held to the remedy of specific performance.[11] "It is ... the rule in this circuit that if specific performance is the applicable remedy, the defendant must be resentenced by a different district judge than the one who presided over the now-vacated original sentence." *United States v. Nolan–Cooper*, 155 F.3d at 241 (applying the requirements of *Santobello v. New York*, 404 U.S. at 263, 92 S.Ct. at 499). *See United States v. Badaracco*, 954 F.2d 928, 941 (3d Cir.1992)("Because [defendant] has already served a considerable portion of a custodial sentence, permitting the withdrawal of his plea would be an empty remedy. It follows that specific performance is the only adequate remedy, *i.e.,* resentencing under conditions in which the government adheres to its plea agreement."). The sentence imposed on Almodovar will be vacated, and the case reassigned for resentencing before another judge.

## V. Remaining Grounds

The remaining grounds for relief are as follows:

■ First, defendant challenges the application of the crack cocaine guidelines. Upon evidentiary hearings, it was found that the government had met its burden of establishing that the substance involved was crack. Memorandum opinion, March 14, 1996 at 4. This finding was affirmed. *United States v. Almodovar*, 100 F.3d 948 (3d Cir.1996) (slip op. at 2 n. 1). Section 2255 motions "may not be employed to relitigate questions which were raised and considered on direct appeal." *See United*

*States v. DeRewal*, 10 F.3d 100, 105 n. 4 (3d Cir.1993) (citation omitted).

■ Second, defendant's argument that the disparity between his sentence and the sentences of his co-conspirators requires downward departure under *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), is also rejected. The Sentencing Guidelines permit departure based on factors outside the "heartland" created by the sentencing guidelines. The *Koon* decision, which post-dates defendant's sentencing, clarifies certain departure issues. However, whether or not *Koon* would benefit petitioner, this argument is rejected on the merits. See memorandum opinion, March 14, 1996 at 6. *Koon* does not change the standard established by our Court of Appeals that disparity of sentences is not a proper basis for downward departure. *See United States v. Higgins*, 967 F.2d 841, 845 (3d Cir.1992).[12]

■ Defendant's argument that it was error to add two points for obstruction of justice will be dismissed. Defendant has asserted no reason to contradict the previous finding that a two-point addition was appropriate under U.S.S.G. § 3C1.1. Memorandum opinion, March 14, 1996 at 9. Moreover, because defendant failed to raise this issue on direct appeal, absent evidence of cause and prejudice, it is procedurally defaulted. *See United States v. Essig*, 10 F.3d 968, 979 (3d Cir.1993).

## VI. Conclusions

1. The testimony of defense witnesses and of prosecution witnesses not in conflict

---

who had been the first to cooperate and helped bring the organization "to its knees" cannot be totally disregarded in considering the issue of bad faith.

11. "Specific performance is feasible and is a lesser burden on the government and defendant.... Given nothing more than the prosecutor's breach, the circumstances do not 'require' a new trial." *United States v. Nolan–Cooper*, 155 F.3d 221, 241 (3d Cir.1998)(citing

*United States v. Kurkculer,* 918 F.2d 295, 302 (1st Cir.1990)).

12. Furthermore, the disparity between defendant's sentence and the sentences imposed on the members of the Chappel Davis group is explained both by the application of the crack cocaine guidelines in defendant's case as well as the government's refusal to file a downward departure motion.

**310**

therewith was substantially credible and worthy of belief.

2. Under the facts of this case, the government acted in bad faith by not agreeing to give defendant an opportunity to cooperate in April, 1994, prior to the last sentencing continuance, and thereafter retracting the offer.

3. The government also acted in bad faith in consenting to seven continuances for cooperation when the reasons it eventually gave in its sentencing memorandum for denying the § 5K1.1 motion were known to it more than a year earlier, before the first continuance and after defendant had already given substantial assistance.

4. The government shall file a § 5K1.1 motion, 18 U.S.C. § 3553(e) motion, and this action will be re-assigned to another judge for sentencing, in accord with *United States v. Isaac*, 141 F.3d 477 (3d Cir. 1998).

5. The other § 2255 grounds for relief are without merit.

### *ORDER*

AND NOW, this 26th day of May, 2000, upon hearing, defendant Juan Almodovar's motion to vacate, alter, or set aside sentence is granted in part and denied in part. 28 U.S.C. § 2255. Defendant's sentence shall be vacated immediately before resentencing. This action shall be assigned to another judge for resentencing, and the government is directed to file a motion for downward departure on behalf of defendant for substantial assistance under U.S.S.G. § 5K1.1, 18 U.S.C. § 3553(e).